MORRIS KANDINOV LLP
Leonid Kandinov (279650)
Andrew Robertson (*pro hac vice* forthcoming)
550 West B Street, 4th Floor
San Diego, CA 92101
(877) 216-1552
leo@moka.law
andrew@moka.law

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ZALMON UVAYDOV, Derivatively on Behalf of Nominal Defendant LUCID GROUP, INC., <br><br> Plaintiff, <br><br> v. <br><br> PETER RAWLINSON, TURQI ALNOWAISER, ANDREW LIVERIS, NICHELLE MAYNARD-ELLIOT, JANET WONG, GLENN AUGUST, ANTHONY POSAWATZ, NANCY GIOIA, and FRANK LINDENBERG, <br><br> Defendants, <br><br> and <br><br> LUCID GROUP, INC., <br><br> Nominal Defendant. | Case No. 3:25-cv-943 <br><br> VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT <br><br><br> DEMAND FOR JURY TRIAL |

Plaintiff Zalmon Uvaydov ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant Lucid Group, Inc. ("Lucid" or the "Company"), against certain of its current and former executive officers and members of the Company's Board of Directors (the "Board") for breaches of fiduciary duties, unjust enrichment, waste of corporate assets, and violations of Sections 10(b) and 21D of the Securities Exchange Act of 1934 (the "Exchange Act"). Plaintiff alleges the following upon knowledge as to himself, and

upon information and belief as to all matters, based upon an investigation conducted by counsel. Counsel's investigation included, among other things: (a) review of the Company's website, press releases, and filings with the U.S. Securities and Exchange Commission ("SEC"); (b) review of news and analyst reports concerning the Company; (c) review of pleadings, orders, and filings in connection with other litigations involving the Company; and (d) review of more than 700 pages of documents (the "Section 220 Documents") produced by the Company in response to Plaintiff's demand for corporate books and records pursuant to 8 *Del. C.* § 220.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by Lucid's officers and directors.

2.     Lucid is a Delaware corporation based in Newark, California, that manufactures electric vehicles and supplies advanced electric vehicle powertrain systems.

3.     The Individual Defendants (as defined below) made, or caused the Company to make, materially false and misleading statements concerning Lucid's business. Specifically, Rawlinson as Lucid's CEO and as a director misrepresented Lucid's ability to build its vehicles on a scale necessary for widespread commercialization. Instead of accurately representing Lucid's logistics and production capabilities, he instead made fantastical claims about the speed it could bring its products to market and the amount of products it would sell.

4.     These statements were unfounded and untrue. By August 5, 2022, the public began to learn the truth as Lucid admitted it was facing severe production problems and could not meet the production it represented. As a result, tens of billions of dollars of Lucid's market capitalization was erased.   The Company's shares have continued to tumble, now trading at less than $3 a share.

5.     The Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual

Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, that: (1) Lucid faced serious internal logistics and production capability issues; (2) the Company did not have, and was extremely unlikely to soon develop, the production capability it represented it could achieve; (3) as a result of the foregoing, the statements complained of herein about the Company's business and prospects were materially false and misleading at the time they were made; and (4) the Company failed to maintain adequate internal controls. As a result of the foregoing, Lucid's public statements were materially false and misleading at all relevant times.

6.     The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact.

7.     Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

8.     The Individual Defendants' misconduct and breaches of duty have subjected the Company and its top officers to a federal securities fraud class action lawsuit pending in the United States District Court for the Northern District of California (the "Securities Class Action"). On August 8, 2024, Judge Araceli Martínez-Olguín issued an order denying in part the defendants' motion to dismiss in the Securities Class Action, paving the way for litigation to proceed.

9.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Action, costs to undertake intake internal investigation and to implement adequate internal controls, and losses from the waste of corporate assets, and losses due to the unjust enrichment of Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from

the wrongdoing alleged herein.

10.    For these reasons and as set forth in greater detail herein, including the Board's unreasonable delay to pursue these matters or obtain tolling agreements, Plaintiff now files this action against the Individual Defendants who abandoned their fiduciary duties and should now be held accountable for the financial and reputational harm suffered by the Company and its shareholders.

## JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 10(b) of the Exchange Act, 15. U.S.C. § 78j(b), and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

12.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

13.    This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

14.    In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

15.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because Nominal Defendant Lucid maintains its principal executive offices in this District and conducts business in this District.

## PARTIES

*Plaintiff*

16.    Plaintiff Zalmon Uvaydov is a shareholder of Lucid common stock and has held Lucid shares continuously during the relevant time period. Uvaydov is a citizen of the United States and

resident of California.

***Nominal Defendant***

17.     Nominal Defendant Lucid is a corporation organized under Delaware law with its principal executive offices located at 7373 Gateway Boulevard, Newark, California, 94560.

18.     The Company, in its current form, resulted from a merger transaction (the "Merger") between Churchill Capital Corporation IV ("Churchill"), a special purpose acquisition company, or "SPAC," and Atieva Inc. d/b/a Lucid Motors ("Legacy Lucid"). The Merger was completed on July 23, 2021. The Company's Class A common stock now trades on NASDAQ under the ticker symbol "LCID."

***Individual Defendants***

19.     Defendant Peter Rawlinson is the Company's Chief Executive Officer ("CEO"), Chief Technology Officer ("CTO") and a director of its Board. Defendant Rawlinson was also Legacy Lucid's CEO and a director from April 2019 to July 2021, and CTO from 2013 to July 2021.

20.     Defendant Turqi Alnowaiser has been Lucid's Chairman of the Board since April 2023, and a director since July 2021. Alnowaiser was also a Legacy Lucid director from April 2019 to July 2021.

21.     Defendant Andrew Liveris has been a Lucid director since July 2021. Liveris was also a Legacy Lucid director from April 2019 to July 2021.

22.     Defendant Nichelle Maynard-Elliott has been a Lucid director since July 2021.

23.     Defendant Janet Wong has been a Lucid director since July 2021. Wong has been the Chair and a member of Lucid's Audit Committee since at least August 2021.

24.     Defendant Glenn August was a Lucid director from July 2021 to June 2024.

25.     Defendant Anthony Posawatz was a Lucid director from July 2021 to April 2023. Posawatz was also a Legacy Lucid director from April 2019 to July 2021.

26.     Defendant Nancy Gioia was a Lucid director from July 2021 to April 2023.

27.     Defendant Frank Lindenberg was a Lucid director from July 2021 to April 2023.

28.     Defendants Rawlinson, Alnowaiser, Liveris, Maynard-Elliott, Wong, August, Posawatz, Gioia, and Lindenberg are referred to herein as the "Individual Defendants."

### FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

29.     By reason of their positions as officers and/or directors of Lucid, and because of their ability to control the business and corporate affairs of Lucid, the Individual Defendants owed Lucid and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Lucid in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Lucid and its shareholders so as to benefit all shareholders equally.

30.     Each director and officer of the Company owes to Lucid and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

31.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Lucid, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

32.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on NASDAQ, the Individual Defendants had a duty to prevent and not to allow the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations, and had a duty to cause the Company

to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

33.    To discharge their duties, the officers and directors of Lucid were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Lucid were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to Lucid's own Code of Business Conduct and Ethics (the "Code of Conduct");

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how Lucid conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of Lucid and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Lucid's operations would comply with all applicable laws and Lucid's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    exercise reasonable control and supervision over the public statements made

by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, inter alia, each of the subjects and duties set forth above.

34.    Each of the Individual Defendants further owed to Lucid and the shareholders the duty of loyalty requiring that each favor Lucid's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

35.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Lucid and were at all times acting within the course and scope of such agency.

36.    The Company's Code of Business Conduct and Ethics dated July 23, 2021, which applies to all of the Company's directors officers, and employees, including Defendants, requires that:

> Lucid Group, Inc. (together with its subsidiaries, the "Company") is committed to maintaining the highest standards of business conduct and ethics. This Code of Business Conduct and Ethics (this "Code") reflects the business practices and principles of behavior that support this commitment. We expect every employee, independent contractor, officer and director of the Company or any majorityowned subsidiary of the Company (collectively, "Personnel") to not only read and understand the business practices and principles described below, but to also apply good judgment and the highest personal ethical standards in making business decisions. Please remember you should consider not only your own conduct, but also that of your family members, significant others and other people in your household. References in the Code to employees are intended to cover officers and, as applicable, directors.
>
> *    *    *
>
> Any employee who violates the standards in this Code may be subject to disciplinary action, that, depending on the nature of the violation and the history of the employee, may range from a warning or reprimand to termination of employment and, in appropriate cases, civil legal action or referral for criminal prosecution.
>
> *    *    *
>
> It is our policy to promote high standards of integrity by conducting our affairs in

an honest and ethical manner.

37.     In addition to the foregoing generally applicable duties, under the Audit Committee Charter, the Audit Committee directors owe specific duties to Lucid and its shareholders to assist in oversight of "the accounting and financial reporting processes and internal controls of the Company" and "the audit and integrity of the Company's financial statements."

38.     The Audit Committee Charter further requires the Audit Committee to

> review the Company's disclosure controls and procedures and internal control over financial reporting. The review of internal control over financial reporting shall include whether there are any significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to affect the Company's ability to record, process, summarize and report financial information and any fraud involving management or other employees with a significant role in internal control over financial reporting. The Committee shall also review any special audit steps adopted in light of material control deficiencies.

39.     Because of their advisory, executive, managerial, and directorial positions with Lucid, each of the Individual Defendants had access to adverse, non-public information about the Company.

40.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Lucid.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

41.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

42.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment.

43.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws.

44.     In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

45.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

## **FACTUAL ALLEGATIONS**

### ***Background on Lucid and the Merger***

46.     Lucid is a technology and automotive company that manufactures and sells electric vehicles and electric powertrains. Lucid exists in its current form as a result of the Merger.

47.     CCIV conducted its initial public offering on August 3, 2020, selling 180 million units at $10 per unit.  Each unit consists of one share of the Company's Class A common stock and one-fifth of one warrant, with each whole warrant entitling the holder to purchase one share of the Company's Class A common stock at an exercise price of $11.50 per share.

48.     Six months after going public, news organizations began reporting that Churchill was in talks to acquire Legacy Lucid.  On January 11, 2021, Bloomberg News published an article titled, "Lucid Motors Is in Talks to List Via Michael Klein SPAC."  The article stated that "Lucid Motors

Inc. is in talks to go public through a merger with one of Michael Klein's special purpose acquisition companies, according to people familiar with the matter." Additional articles in the financial press soon followed.

49.    According to the Registration Statement on Form S-4 issued on March 22, 2021, "at the time the [Bloomberg News] article was published, Churchill and Lucid had not had any discussions with respect to a potential business combination." Though, also on January 11, 2021, Michael Klein, CCIV's CEO, had a telephone call with financial advisors for Legacy Lucid about a combination between CCIV and Legacy Lucid. The negotiations moved quickly from there, with CCIV sending a proposal to acquire Lucid on January 14, 2021. Approximately a month later, on February 22, 2021, the Board approved the acquisition of Legacy Lucid. The companies executed a merger agreement that same day and CCIV and Legacy Lucid announced the transaction. On July 23, 2021, CCIV and Legacy Lucid closed the Merger.

50.    At this time and throughout the relevant period, Legacy Lucid, and post-Merger, Lucid, made a single vehicle, the "Lucid Air." The Lucid Air is an ultra-luxury vehicle, selling for between $69,900 and $161,500 (after tax credits). Lucid called the Air "the most advanced electric vehicle[] in the world," pointing to its range, 520 miles on a single charge. The longest range for Tesla cars, the leader in electric vehicles, was 405 miles on a single charge, as a comparison.

51.    There was considerable buzz about the Lucid Air before it even hit the market. The Company's ability to capitalize on this buzz, and therefore its success as a nascent car manufacturer, depended on it quickly producing the Lucid Air on a mass market basis. Because, while potential customers "reserved" future cars for purchase, the Company could not actually recognize any revenue from sales until these customers took delivery of their cars. Indeed, in September 2021, Rawlinson admitted, "[t]here's no point in having a 520[-]mile car out there if no one's driving it…. Until we get this thing into production, we haven't achieved a damn thing."

52.    Before the announcement of the Merger, Rawlinson told the public that Legacy Lucid

expected to produce 6,000 to 7,000 cars in 2021.  In support of these numbers, Rawlinson claimed that "we've already built our first phase of our factory in Arizona, which is good for 34,000 units."  A graphic that appeared during Rawlinson's interview claimed that the Arizona factory was "built" and "fully commissioned."  When CCIV and Legacy Lucid announced the deSPAC Merger, however, they provided updated expectations for 2021.  In contrast to earlier statements, Legacy Lucid only expected to produce 577 Lucid Airs in 2021, less than 10% of Rawlinson's previous claim.

### The Individual Defendants Knowingly Make and/or Cause the Company to Make A Series Of False And Misleading Statements

53.     Markets closely watched Rawlinson and Lucid's statements after the Merger to see how Lucid would operate as a public company.  Investors were monitoring Lucid's ability to mass market the Lucid Air and confirm that any supply chain problems that caused the disappointing 2021 expectations were behind the Company.  Rawlinson assured the market with his public statements.  Unfortunately, these statements were false and misleading.

54.     On November 15, 2021, Lucid issued a press release touting its financial results for the third quarter of the 2021 fiscal year.  In the press release, Rawlinson discussed the Company's ability to achieve its production goal of 20,000 units in 2022, despite global disruptions to supply chains.  In particular, the press release quoted Rawlinson as stating:

> We see significant demand for the award-winning Lucid Air, with accelerating reservations as we ramp production at our factory in Arizona. *We remain confident in* our ability to achieve 20,000 units in 2022. This target is not without risk, given ongoing challenges facing the automotive industry with global disruptions to supply chains and logistics. We are taking steps to mitigate these challenges, however, and look forward to the launch of the Grand Touring, Touring, and Pure versions of Lucid Air through 2022.

55.     That same day, Rawlinson participated in an earnings conference call hosted by Lucid to discuss the Company's results.  During the call, Rawlinson stated, "[e]ven in a challenging environment as COVID-19 continues to present numerous obstacles for the auto industry and supply

chain. Lucid is no stranger to this, but we have continued to deliver against our timeline and with the highest standard of quality."

56.     The next day, on November 16, 2021, Rawlinson participated in an interview on CNBC with host Jim Cramer. During the interview, Rawlinson stated that Lucid's factory was ready to produce 34,00 units a year. In particular, Rawlinson stated, "We already have a factory scale for 34,000 units a year. As soon as we can get this quality parts to the line, we can spool that up. The factory is there and ready for 34,000 units per annum."

57.     During the interview, Rawlinson claimed that supply chain issues were the result of general global issues and even those Lucid was able to mitigate. In particular, the following exchange occurred:

> CRAMER: "So if I go under the hood, which fortunately could be in a size of a suitcase, will I find the same Semiconductor shortage problem? Will I find the labor problem? I find all the things that are plaguing every other company in the automotive business. Or would they be looking at, say, an Apple phone and saying, you know what? Look, we've got the technology, the customers love it, and let's stop worrying about things that don't really mean anything to us."

> RAWLINSON: "We've been able to mitigate the semiconductor risk because as a tech company, we design all our printed circuit boards, our PCBAs, in house, and that means that we can design for alternative sourcing and different types of chip and that will reduce the risk. So we've been able to mitigate that risk. That isn't to say we aren't vulnerable to today's supply chain shortages that the entire industry is facing, in fact, many industries are facing, that is something that we are a challenge with and we have mitigation plans for."

58.     Lucid's stock price, and resulting market capitalization, jumped on Rawlinson's statements. In particular, on November 16, 2021, Lucid's stock price closed at $55.52 per share, up from $44.88 per share the day before, resulting in a market capitalization of $91.4 billion, up from $73.8 billion.

59.     Unfortunately, Rawlinson's statements were false and misleading. Lucid could not produce the amount of Lucid Airs claimed and its supply chain problems were not due to global

industrywide problems. Rather, the Company's own internal operational failings were preventing Lucid from producing the Lucid Air at the scale claimed in Rawlinson's public statements. The reasonable inference is that Rawlinson knew that his statements were untrue. Lucid only created a single product, the Lucid Air. The development and sale of the Lucid Air was mission critical to the Company's success. In addition, Lucid had only a single production facility, its factory in Casa Grande, Arizona. Thus, it would be readily apparent to Rawlinson that the Company could not produce tens of thousands of cars, particularly since he had overseen bringing Tesla's model S to market.

60.     Statements by confidential witnesses given to the plaintiffs in the related Securities Class Action support Rawlinson's knowledge of the true state of Lucid's production capabilities. A former employee 1 ("FE-1"), stated that during meetings with Rawlinson in September 2021 and November 2021, FE-1 personally told Rawlinson, in the context of discussing Lucid's internal logistics issues, that because of all of those issues, Lucid would never meet its production goals, to which Rawlinson reacted by nodding his head. FE-1 knew firsthand Lucid's logistical issues because FE-1 worked for Lucid in several managerial and supervisory roles relating to logistics from mid-2021 to mid-2022 and at the facility in Casa Grande. FE- 1 also supervised and had responsibilities concerning Lucid's internal logistics. By late summer 2021, FE-1 moved to and was working at Lucid's Warehouse, where he remained for the rest of his tenure at Lucid.

61.     Another former employee ("FE-2") worked for Lucid in multiple positions in the Company's Logistics Department from the summer of 2020 to the end of 2021. From the end of 2020 to the end of 2021, FE-2 held coordinator and supervisory roles in Lucid's Warehouse. FE-2 stated that during meetings held during October 2021, Rawlinson and others made statements that Lucid was going to miss its year-end vehicle production targets for 2021, 2022, and 2023, and directed employees to keep the information confidential and not to share it. FE-2 also stated that at one meeting, held in October 2021 or the first week of November 2021, Rawlinson stated Lucid would

make less than 10,000 vehicles in 2022, less than half what Rawlinson was representing publicly. Again, according to FE-2, Rawlinson instructed employees that this information should be kept in your "belt loop." FE-2 also indicated that Rawlinson only discussed the fact that Lucid would miss its production targets in the smaller group setting, presumably to keep leaks from the public, and that Rawlinson was telling them so they would not overwork themselves trying to meet targets that Lucid could not make.

62.     In a hearing on the motion to dismiss in the Securities Class Action, counsel for Rawlinson stated that "Rawlinson, came to the factory to try and really focus people on addressing these issues." Thus, Rawlinson's own counsel conceded that Rawlinson knew about the true issues facing Lucid and personally went to the Company's factory to try address them.

63.     Notwithstanding this, Rawlinson continued to mislead investors in 2022.

64.     On February 28, 2022, Lucid issued a press release on Form 8-K entitled, *Lucid Announces Fourth Quarter and Full Year 2021 Financial Results, Updates 2022 Outlook.*

65.     The press release stated the following: "Updating 2022 production outlook for Lucid Air to a range of 12,000 to 14,000 vehicles."

66.     In the same press release, Rawlinson stated: "Looking ahead, we're updating our outlook for 2022 production to a range of 12,000 to 14,000 vehicles. This reflects the extraordinary supply chain and logistics challenges we've encountered and our unrelenting focus on delivering the highest-quality products."

67.     On February 28, 2022, Lucid hosted an earnings call to discuss its fourth quarter and full year 2021 financial results.

68.     During the earnings call, Rawlinson stated: "In the more immediate term, ***like many manufacturers, our production has been and indeed continued to be impacted by supply chain challenges***. As you saw from our press release today, ***we have updated our 2022 production outlook***

*for Lucid Air to a range of 12,000 to 14,000 vehicles.*"

69.     Rawlinson also stated: "We accomplished deep deliveries against the backdrop of an extraordinary supply chain and supply quality challenges. ***Indeed, we could have chosen to build faster***, but we elected not to sacrifice quality, given our unwavering commitment to the highest standards."

70.     During the earnings call, Itay Michaeli – Citigroup Inc., Research Division – Director & Global Head of Autos Sector, asked:

> A couple of questions. Just first, going back to the supply chain pressures. I was hoping you can maybe articulate it sounds like you expect most of the recovery to happen in the second half of the year. Maybe talk about how much visibility you have over the next few months with some of the suppliers you mentioned and just the degree of confidence of how to think about the cadence of improvement in production throughout the year.

71.     Rawlinson responded to Michaeli and stated:

> Yes. Well, we have an earning focus on addressing some of the supply chain challenges. We see them to continue for the next few months. ***But we see an uptake in the second half of the year. So we're really optimistic that we're going to be able to resolve these. And again, this is a small handful of suppliers. We're not talking about fundamental technologies here. We're talking largely paradoxically commodity suppliers, finishes, carpet, glass and things like that. And unfortunately, you can't sell a single quality car unless those -- particularly those visible parts are absolutely perfect. So we're very optimistic that we will resolve, but it's going to take a few months, and the second half of the year, we'll see a significant uptake. And our guidance is based upon that premise.***

72.     Also during the call, John Joseph Murphy – BofA Securities, Research Division – MD and Lead United States Auto Analyst, asked:

> [A]s you think about the causal factors for the reduction in your planned production this year, I mean, you're citing supply chain. It appears that maybe some of the capacity expansion and reorganization has put forth or been prioritized over ramping volume in the near term for the benefit in the long term, and there might be some other micro issues that we can't see.
> I'm just wondering if you could kind of bucket those or maybe rank those in order of sort of impact. And then also as we think about this, does this change your outlook for 2023 volumes? Or is this sort of short-term pain for long-term gain?

73.     In response, Rawlinson stated:

> Those are interesting points. ***I mean, first of all, I would say that we have been primarily constrained. We've got about 250 suppliers worldwide, notionally about 3,000 parts. And this has been really a phenomenon of just a small handful of our 250***

*suppliers. Paradoxically, we've been mainly impacted in a commodity supply parts. For example, finished parts, trim parts for the exterior, even glass and carpet. So it's not the core technologies of the vehicle that have been largely impacting us here.* And we have – you're right, we've chosen quality over volume.

74.    Rawlinson's statements regarding the Company were false and misleading. In particular, Rawlinson and other Defendants concealed from the market the panoply of internal issues unique to Lucid that had already severely impacted—and were continuing to impact—the Company's production of the Lucid Air, including that Lucid faced severe internal inventory management issues, warehouse and logistics issues, incorrect design of parts, and sourcing issues.

75.    Yet Rawlinson and other Defendants continued to mislead investors.

76.    On March 17, 2022, Reuters reported the following in an article entitled, *Rising Costs Have Lucid CEO Eyeing Price Hike for Future Electric Cars*:

> Lucid in February cut its production forecast for this year to a range of 12,000 to 14,000, from its original target of 20,000 vehicles, citing "extraordinary supply chain and logistics challenges." Its shares slid after that announcement. Rawlinson on Thursday said the bottlenecks were caused by a handful of suppliers for windshield glass, carpeting and some exterior trim parts. "I'm super frustrated because we're not gated by silicon chips, we're not gated by our ability to make electric motors," Rawlinson said.

77.    Rawlinson knew this was false and misleading because, at best, it was only partially accurate as internal logistical and inventory problems at the warehouse and production line were the primary culprits for production slowdown.

78.    On May 5, 2022, Lucid issued a press release on Form 8-K entitled, *Lucid Reports First Quarter 2022 Financial Results*.

79.    In the press release, Defendants stated that "Lucid reiterated its 2022 production volume outlook of 12,000 to 14,000 vehicles" and that Lucid's "[p]roduction volume outlook for 2022 remains on track at 12,000 to 14,000 vehicles."

80.    The same day, May 5, 2022, Lucid hosted an earnings call to discuss its first quarter

2022 financial results. During the earnings call, Rawlinson stated: "I do want to highlight that supply chain dynamics are very fluid, and the COVID lockdowns in China that's impacting others in the industry are also resulting in some bottlenecks for us."

81.    During the call, Itay Michaeli – Citigroup Inc., Research Division – Director & Global Head of Autos Sector, asked if Lucid could provide "[a]ny kind of early update on Q2, maybe an April number?"

82.    In response to this question, Rawlinson stated that "[w]e're reiterating our 12,000 to 14,000 vehicle production forecast for '22. And that's based on the information we have at this point, combined with our current mitigation plans."

83.    In conjunction with the May 5, 2022 earnings call, Defendants published a slide which stated: "Production Volume 12,000-14,000 vehicles."

84.    Yet Rawlinson and other Defendants knew in late 2021 that Lucid had no reasonable basis to believe it would produce more than 10,000 vehicles in 2022.

***Investors Learn The Truth And Sue Lucid***

85.    Investors had no way to know the truth, and the partial truth behind the Company's business prospects began to emerge at the earliest on February 28, 2022, when Lucid issued a press release disclosing that it only delivered approximately 125 vehicles through the end of 2021 and reducing expected 2022 vehicle production from 20,000 vehicles to between 12,000 and 14,000 vehicles.

86.    After this release, Lucid's stock price fell more than 13%, or $3.99 per share, to a close at $24.99 per share on March 1, 2022, as compared to $28.98 per share on February 28, 2022, the prior day, a $6.5 billion market capitalization loss. However, Rawlinson failed to disclose the true reasons behind Lucid's inability to produce vehicles in a timely fashion.

87.    On August 3, 2022, Lucid again decreased its 2022 vehicles production guidance to just

between 6,000 and 7,000 vehicles in 2022.  Indeed,  in the first six months of 2022, Lucid had only produced 1,405 vehicles.

88.    Unlike in previous statements, however, Lucid revealed that it was not COVID-19-related or global supply chain issues causing the production slowdown, but Lucid's own internal logistics problems.  In particular, Rawlinson explained that "[o]ur revised outlook guidance for the year reflects the logistic challenges I described as we begin scaling, which exposed the immaturity of our logistics processes."  These logistic process issues caused Lucid to experience "unplanned production pauses."

89.    Rawlinson also disclosed that Lucid was taking steps to fix the internal logistics problems that he referred to as the "primary bottlenecks," including bringing "logistics operations in-house" and "restructur[ing] ... logistics and manufacturing operations," which Rawlinson said should "help mitigate and begin to eliminate the logistics bottlenecks."

90.    Over the next two days, Lucid's stock price fell to just $18.05 per share, reducing its market capitalization to approximately $30.2 billion, one third of the peak it reached on November 16, 2021 of over $91.4 billion.

91.    Lucid's poor performance continued.  For 2022, the Company only built 7,180 cars and only delivered 4,369 of them.  Lucid did slightly better in 2023, delivering 6,001 of the 8,428 vehicles it built.  However, these amounts were still well below the tens of thousands of vehicles Rawlinson claimed Lucid would make.

92.    On April 1, 2022, an investor sued Lucid and Rawlinson regarding their false and misleading statements in the U.S. District Court for the Northern District of California.  A second investor sued on May 31, 2022. After the cases were consolidated, on December 13, 2022, the lead plaintiff filed an amended complaint.  On August 8, 2024, Judge Araceli Martínez-Olguín denied the defendants' motion to dismiss as to some of the challenged statements.  In ruling, the court held that

the plaintiff adequately alleged Rawlinson made false and misleading statements with scienter.

93.     Pointing to the financial motive, his hands-on involvement, and the "core operations inference," the court held that "as to Rawlinson, the inference of intent to defraud here is at least as compelling as an inference of innocent conduct."

### Rawlinson's Compensation Motivated Him To Make False Statements

94.     Rawlinson had a massive financial incentive to close the Merger and then keep the Company's stock price inflated for the following six months.  By closing the Merger, Rawlinson was able to secure for himself a $2 million bonus.  Rawlinson then had in place an incentive plan that awarded him millions of RSUs that would only vest based on the Company's average market capitalization over a 6-month period.

95.     In particular, Rawlinson's incentive plan had 5 different tranches for the RSUs vesting at increasing market capitalization amounts, as shown in the following table:

| Tranche | # of CEO Performance RSUs | 6-Month Market Capitalization | Multiple of Initial Valuation[1] | Cumulative Growth Rate |
|---|---|---|---|---|
| 1 | 3,483,568 | $23.50 billion | 2X | 100% |
| 2 | 3,483,568 | $35.25 billion | 3X | 200% |
| 3 | 3,483,568 | $47.00 billion | 4X | 300% |
| 4 | 3,483,568 | $58.75 billion | 5X | 400% |
| 5 | 2,090,140 | $70.50 billion | 6X | 500% |

96.     On March 5, 2022, the Board agreed that Lucid had achieved a 6-month average market capitalization of $61.98 billion as of January 25, 2022.  As a result, Rawlinson's 13,934,272 "performance" RSUs relating to Tranche 1, Tranche 2, Tranche 3, and Tranche 4 vested on March 5, 2022 and were settled on March 7, 2022.  At that time, the 13,934,271 "performance" RSUs were worth $315,332,522.

97.    Lucid, however, only reached this lofty 6-month market capitalization due to Rawlinson's knowingly false public statements regarding the Company's ability to produce Lucid Airs at scale and obfuscation of the reasons for this failure. By the time the truth was finally fully disclosed about Lucid's "immature" production capabilities, after multiple decreases in production estimates, the Company's market capitalization was cut in half, to under $30 billion.  At this market capitalization, only the first tranche of Rawlinson's "performance RSUs" would vest.  Because the second, third, and fourth tranches only vested due to Rawlinson's false statements, the vesting of these tranches associated "performance" RSUs was undeserved and his retention of the performance RSUs unjust.

## DAMAGES TO LUCID

98.    As a direct and proximate result of Defendants' breaches of fiduciary duty, Lucid's market capitalization has been substantially damaged, resulting in a massive decline in shareholder value. Lucid has lost almost $86 billion market capitalization from its high of $91.4 billion after the November false statement to its low of $5.5 billion on April 22, 2024.

99.    In addition, Lucid has lost and expended, and will continue to lose and expend, millions of dollars due to, among other things: (a) payment of substantial compensation to Defendants, who failed to perform their duties in good faith and in the best interest of the Company; (b) liability to certain shareholders in connection with the Securities Class Action and other litigation; (c) defense costs in connection with the foregoing litigations, including defense costs advanced or reimbursed to the Company's offices and directors in connection with those matters.

100.    Defendants' breaches of fiduciary duty also have damaged the Company's reputation within the business community and capital markets, and the Company's ability to raise capital on favorable terms now and in the future is impaired. The Company stands to incur higher costs of capital and debt because Defendants' false and misleading statements have materially increased the perceived risks of investing in and lending to the Company.

101.    Lucid paid Rawlinson significant compensation in the form of bonuses and performance RSUs directly due to his wrongful conduct that misled investors and inflated Lucid's market capitalization.

102.    Plaintiff seeks to remedy the foregoing harms through the recovery of monetary damages and implementation of corporate governance reforms.

## DEMAND FUTILITY ALLEGATIONS

103.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties by the Individual Defendants.

104.    Plaintiff is an owner of Lucid common stock and has been a continuous shareholder of Company stock at all relevant times.

105.    Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

106.    At the time this action was commenced, the nine-member Board consisted of Defendants Alnowaiser, Liveris, Maynard-Elliott, Rawlinson, Wong and non-Defendants Lambert, Marakby, Nouri, Winitzer.

107.    A pre-suit demand on the Board is futile and, therefore, excused because a majority of the Board's directors face a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause Lucid to make false and misleading statements and omissions of material facts while failing to disclose the truth and failing to correct the false and misleading statements and omissions of material facts, or to fail to disclose and/or cause the Company to fail to disclose the truth or correct the false and misleading statements and omissions of material facts.

108.    Defendant Rawlinson is named as a primary defendant in the Securities Class Action that survived a motion to dismiss.  In her ruling, Judge Olguín held that the plaintiff in the Securities

Class Action adequately alleged Rawlinson made false and misleading statements with scienter. Pointing to the financial motive, his hands-on involvement, and the "core operations inference," Judge Olguín held that "as to Rawlinson, the inference of intent to defraud here is at least as compelling as an inference of innocent conduct."

109.    In complete abdication of their fiduciary duties, defendants Alnowaiser, Liveris, Maynard-Elliott, and Wong either knowingly or recklessly participated in the foregoing scheme. The improper scheme was intended to make Lucid appear more profitable and attractive to investors. Moreover, the Individual Defendants caused Lucid to fail to maintain internal controls. As a result of the foregoing, the Individual Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused. Each of the Individual Defendants aided and abetted the others in their breach of fiduciary duties, and they therefore face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

110.    The acts complained of herein constitute violations of fiduciary duties owed by the Individual Defendants and the aiding and abetting thereof, and these acts are incapable of ratification.

111.    The Individual Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of Lucid. If there is a directors' and officers' liability insurance policy covering the Individual Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, inter alia, the "insured-versus-insured exclusion." As a result, if the Individual Defendants were to sue themselves or certain of the officers or directors of Lucid, there would be no directors' and officers' insurance protection. Accordingly, the Individual Defendants cannot be expected to bring such a suit.

On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Individual Defendants is futile and, therefore, excused.

112.     If there is no directors' and officers' liability insurance, then the Individual Defendants will not cause Lucid to sue themselves since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

113.     Thus, for all of the reasons set forth above, a majority of the Directors, and, if not all of them, at least five of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## COUNT I

### Against Defendant Rawlinson for Contribution
### Under Sections 10(b) and 21D of the Exchange Act

114.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

115.     The Company and defendant Rawlinson are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to defendant Rawlinson's willful and/or reckless violations of their obligations as controlling shareholder, officers, and/or directors of Lucid.

116.     Defendant Rawlinson because of his position of control and authority, was able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Lucid, including the wrongful acts complained of herein and in the Securities Class Action.

117.     Accordingly, defendant Rawlinson is liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f),

which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

118.    As such, Lucid is entitled to receive all appropriate contribution or indemnification from defendant Rawlinson.

## COUNT II

**Against the Individual Defendants
for Breach of Fiduciary Duty**

119.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

120.    The Individual Defendants owe the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, candor, loyalty, and due care.

121.    The Individual Defendants willfully ignored the obvious deficiencies in the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

122.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

123.    As a direct and proximate result of the Individual Defendants' failure to fulfill their

fiduciary obligations, the Company has sustained significant damages.

124.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

125.    Plaintiff, on behalf of Lucid, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Aiding and Abetting Breach of Fiduciary Duty

126.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

127.    By encouraging and accomplishing the illegal and improper disclosures alleged herein and concealing the truth from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breach of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

128.    Plaintiff on behalf of Lucid has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants for Unjust Enrichment

129.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

130.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Lucid.

131.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Lucid that was tied to the performance or artificially inflated valuation of Lucid or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

132.    Plaintiff, as a shareholder and a representative of Lucid, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

133.    Plaintiff on behalf of Lucid has no adequate remedy at law.

## <u>COUNT V</u>

### Against the Individual Defendants for Waste of Corporate Assets

134.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

135.    The Individual Defendants breached their fiduciary duties by failing to properly supervise and monitor the adequacy of the Company's internal controls, by issuing, causing the issuance of, and/or failing to correct the false and misleading statements identified herein, and by allowing the Company to engage in an illegal, unethical, and improper course of conduct, which was continuous, connected, and ongoing at all relevant times.

136.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (a) paying and collecting excessive compensation and bonuses; and (b) incurring potentially millions of dollars of legal liability and/or legal costs, including defending the Company and its officers against the Securities Class Action.

137.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

138.    Plaintiff on behalf of Lucid has no adequate remedy at law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.    Declaring that Plaintiff may maintain this derivative action on behalf of Lucid and that Plaintiff is a proper and adequate representative of the Company;

B.    Awarding the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties and unjust enrichment;

C.    Directing Lucid to take all necessary actions to reform and improve its corporate governance and internal procedures to protect Lucid and its stockholders from a repeat of the damaging events described herein, including, but not limited to:

- strengthening the Board's supervision of operations and compliance with applicable state and federal laws and regulations;

- strengthening the Company's internal reporting and financial disclosure controls;

- developing and implementing procedures for greater shareholder input into the policies and guidelines of the Board; and

- strengthening the Company's internal operational control functions;

C.    Awarding punitive damages;

D.    Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury.

1   Dated: January 29, 2025

2                                                    /s/ Leonid Kandinov
                                                     **MORRIS KANDINOV LLP**
3                                                    Leonid Kandinov (279650)
                                                     Andrew Robertson
4                                                    550 West B Street, 4th Floor
                                                     San Diego, CA 92101
5                                                    (877) 216-1552
                                                     leo@moka.law
6                                                    andrew@moka.law

7                                                    *Attorneys for Plaintiff Zalmon Uvaydov*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT